KLIEBERT, Judge.
Mr. James Mayeux (hereafter Mayeux) sued Cane Air, Inc. for damages to his soybean crop allegedly caused by the spraying of a phenoxy chemical herbicide over 230 acres of soybeans in July and August of 1978. In turn, Cane Air, Inc. (hereinafter Cane Air) brought a third party claim against Riverside Chemical, Inc. (hereafter Riverside), a supplier of one of the chemicals sprayed on the soybeans. Thereafter, Mayeux amended his pleadings to include Riverside as a defendant. The trial judge rendered judgment in favor of Mayeux and against Cane Air for $16,163.54 and dismissed all claims against Riverside. Cane Air suspensively appeals the trial court’s judgment. The essence of its assignments of error are that the trial judge erred in finding that the soybeans were damaged by a phenoxy chemical and/or that Cane Air sprayed a phenoxy chemical on Mayeux’s soybeans. We reverse the trial court on the second assignment of error.
In mid-July of 1978, James Mayeux, a farmer in St. John the Baptist Parish, contacted Cane Air, an aerial application firm, to have a 230 acre tract of Forrest variety soybeans sprayed with chemicals. The tract was a portion of the Belle Point Plantation located north of the Airline Highway (U.S. 61). On the westernmost edge of the tract was the East St. John High School and on the easternmost portion was the LaPlace Chrysler Plymouth lot. Under the agreement reached by the parties, Cane Air was to provide Methyl-Parathion (an insecticide purchased from “Riverside”) and Mayeux was to provide Benlate (a fungicide he acquired from the U.S. Department of Agriculture). The Benlate was to be mixed with the Methyl Parathion and then sprayed over the 230 acre tract. Pursuant to the agreement, Cane Air sprayed the westernmost 90 to 100 acres of the 230 acre tract on July 19, 1978. On July 20, 1978, the remaining acreage in the tract, except for a six acre plot located in the easternmost edge (adjacent to the LaPlace Chrysler-Plymouth lot) was sprayed by Cane Air. *307 On both days the wind was strong and blowing out of the south-southeast and Mayeux personally flagged (moved a marker in the field to show the area sprayed) for the pilot. On August 4,1978, the entire 230 acre tract was sprayed. On August 23, 1978, the easternmost 50 acres of the 230 acre tract was sprayed with Methyl-Parathion. Mayeux did not do any flagging on this occasion.
The issues presented in the trial court and here are (1) Was there damage to the soybeans from a phenoxy chemical, and if so, (2) who or what caused the distribution of the phenoxy chemical over the 230 acre tract of soybeans. The essence of Mayeux’s position is that there was phenoxy damage to his crop of soybeans on the 230 acre tract and this damage resulted from the application of a phenoxy by the aerial spraying performed by Cane Air. On the other hand, Cane Air’s position is that there was no phenoxy damage to the soybeans, but should the court conclude otherwise, then the phenoxy chemical which caused the damage was applied by someone other than Cane Air, or in the alternative, if Cane Air is found to be liable, Riverside should be cast in judgment as the supplier of one of the chemicals sprayed by Cane Air.
This is not a La.C.C. Article 667 strict liability case as would be applicable where a neighbor’s crop is damaged by the aerial spraying of a chemical in a nearby field. Whether it is considered a breach of contract suit or a La.C.C. Article 2315 tort action, the plaintiff is required to prove by a preponderance of the evidence that he sustained damages and it is more probable than not defendant’s action or inaction was the cause of the damage sustained. Whereas here, the plaintiff seeks to prove his case by circumstantial evidence, the evidence submitted must exclude other reasonable hypothesis with a fair amount of certainty so that it is more probable than not the damages were caused by the action or lack of action of the defendant. Townsend v. State Department of Highways, 322 So.2d 139 (La.1975); Braud v. Kinchen, 310 So.2d 657 (La.App. 1st Cir.1975).
Following the first two applications by Cane Air, Mayeux noticed some yellowing in his soybeans. He complained to Cane Air and discussed the problem with Mr. Larry Brock, his county agent. In turn, Mr. Brock called on the State Department of Agriculture for assistance. The representatives of that agency who made visual inspections of the field or performed other functions in the investigation were Mr. E.A. Cancienne, Director of Pesticide Commission; Mr. Edsel Elledge, Jr., Agricultural Inspector, and Mr. Ernest Epps, Jr., a chemist jointly employed by LSU and the Department of Agriculture. They in turn called on Dr. Walter Morrison, an agronomist and a soybean specialist with LSU for assistance in making their investigation. Mr. Michael Crawford, Consumer Safety Officer for the United States Environmental Protection Agency was called on by Mayeux and he made an investigation for the purpose of determining whether there was a violation of the federal acts and regulations for the use of phenoxy and report on his findings. After making five visual inspections and considering the information furnished by the others whom he called on for assistance, Mr. Elledge concluded there was insufficient evidence to show phenoxy damage to the soybeans and, hence, terminated further investigation by the Department of Agriculture.
At the trial, Mr. Brock, Mr. Elledge and Dr. Morrison personally appeared and testified. Additionally, Mr. Robert Odom, Jr., a former agricultural inspector and the then Commissioner of Agriculture for the State of Louisiana, appeared as an expert witness in pesticides and crop damage on behalf of Mayeux. Also, Mr. L.B. Davis, an entomologist and agricultural consultant, who qualified as an expert in entomology, soybeans and 2,4r-D (a type of phenoxy), appeared on behalf of Cane Air.
According to the expert witness, some plants are more susceptible to phenoxy damage than others. Hence, on a visual inspection to determine whether there has been a phenoxy application in the field, all types of vegetation growing in the field are *308 examined. All experts testified to the existence of phenoxy damage to weeds such as sesbania (indigo), cockleburs and wild okra. However, with the exception of Dr. Morrison, all testified they found no evidence of phenoxy damage to the soybean plants in the field. Although Dr. Morrison testified to seeing visual evidence of phenoxy damage to soybean plants, he stated there was some doubt in his mind as to whether there was in fact phenoxy damage to the soybean crop. It was for this reason that he suggested the establishment of a test plot which could be used to compare soybean yields in the test plot to those in the suspected phenoxy damaged tract.
All of the experts testified to the existence of Red Crown rot and other diseases throughout the 230 acre tract. The actual disagreement between the experts was whether the visual evidence of phenoxy damage was sufficient to justify a conclusion the soybean crop had in fact sustained phenoxy damage and whether this damage was the cause of a lower yield in the 230 acre tract when compared to the test plot.
Where a crop is damaged rather than destroyed, a commonly accepted method of determining the extent of the damage is to establish a test plot. This plot is selected by the experts and then controlled by them while the suspected damaged crop is growing. The yield from the test plot is then compared to the yield from the suspected damaged crop to determine the extent of the damage. Here, due to the paucity of visual evidence of phenoxy damage to the soybean crop, Dr. Morrison and Mr. Odom suggested the establishment of a test plot. In fact, however, a test plot was not established and controlled by the experts. Instead, Mr. Mayeux selected a portion of the field south of the Airline Highway which he said had not been sprayed by Cane Air and compared its yield to the yield from the 230 acre tract. The experts did not control the test plot and did not oversee the harvest of the crop, hence, they were not in a position to testify as to whether the yield from the 230 acre tract was less than the yield from the field south of the Airline Highway.
The trial judge recognized the paucity of the visual evidence as to phenoxy damage to the soybean crop; but, nevertheless, concluded that based on Mr. Mayeux’s testimony as to the greater yield in a selected plot located south of the Airline Highway as compared to the yield on the 230 acre tract north of the Airline Highway, the 230 acre tract did in fact sustain phenoxy damage. Other than the general testimony that the soil on the entirety of Belle Point is generally the same and that the field south of the Airline Highway was cultivated in the same manner and received the same chemicals (except for the Cane Air sprayings) as the crop north of the Airline Highway, there was no direct evidence to establish the plot selected by Mr. Mayeux for yield comparison was in fact comparable to the 230 acre tract.
Were this a case of first impression, from the evidence submitted, we would have concluded differently from the trial judge; however, under the rules for appellate review set by the Supreme Court, we cannot substitute our view for those of the trial court. To change findings of the trier of the facts, we have to first find he committed manifest error. Since there was evidence from which the trial judge could reasonably conclude there was phenoxy damage to the soybean crop, we cannot say the trial judge committed manifest error in so concluding. See Canter v. Koehring, 283 So.2d 716 (La.1973).
Having reached this conclusion, we now consider the element of causation, i.e., how was the phenoxy chemical distributed over the field?
In seeking to support their respective positions, the litigants urge three ways in which a phenoxy chemical could have been distributed over the field: (1) the Methyl Parathion supplied by Riverside and sprayed on the soybeans by Cane Air contained a phenoxy chemical, (2) a residue of a phenoxy chemical from a spraying prior to the time the Mayeux field was sprayed was left in the tanks of the airplane when spraying Mayeux’s 230 acre tract, and (3) there was a direct application of phenoxy *309 chemicals in the fields by Mayeux which caused the damage.
The only direct evidence of a phenoxy chemical application was (1) the testimony of Mr. Epps, a chemist, submitted by deposition stating that the chemical Methyl Parathion, supplied by Riverside and sprayed by Cane Air, contained 7.8 part per million of phenoxy and that there was phenoxy on soybean plant leaves from a sample collected by Mr. Crawford in the field, and (2) the affidavit and testimony of Mr. Mayeux that he used 2,4-D in a hand sprayer to control weeds on the lot fronting on the Airline Highway adjacent to the soybeans and also that at the same time Cane Air was spraying the fields and while he was serving as a flagman he made direct applications of chemicals containing phenoxy on the headlands adjacent to the lot over which 2,4^D was sprayed with a hand sprayer.
In his reasons for judgment, the trial judge excluded Riverside from responsibility for the following stated reasons:
“This court cannot find Riverside Chemicals Inc., to have been at fault. The testimony of Acosta that Cane-Air-Inc., purchased the methyl parathion from Riverside in 1977 and used it during 1978 with the only complaint being that of Mayeux, coupled with his testimony that a phenoxy had been previously sprayed, and no showing that the spraying equipment was flushed or purged does not bear the proof necessary to hold Riverside at fault.”
The trial judge’s reasons for judgment made no comment as to the application of phenoxy chemicals by Mayeux or of the flushing or purging of the spraying tanks or equipment other than that stated above; but, nevertheless, he cast Cane Air in judgment. We believe he committed manifest error in so concluding.
The plaintiff sought to prove Cane Air’s liability circumstantially, i.e., there was phenoxy damage to the soybean crop which appeared after Cane Air sprayed the crop, therefore, Cane Air applied the phenoxy which caused the damage. Since this is not a strict liability case under Article 667, Mr. Mayeux was obligated to prove his case against Cane Air by a preponderance of the evidence and where his proof is by circumstantial evidence, he was also obligated to exclude other reasonable hypothesis as to the cause of the phenoxy damage with a fair amount of certainty. This he failed to do.
Mr. Epps made a chemical analysis of the Methyl Parathion supplied by Riverside. The sample which he analyzed was taken directly from the container supplied by Riverside. It was not a sample of the mixture of Benlate and Methyl Parathion sprayed by Cane Air. There was no analysis made of the Benlate. All experts agreed the small amount of phenoxy contained in the Menthyl Parathion was insufficient to cause harm to the soybean crop. By refusing to cast Riverside in judgment, the trial judge accepted that opinion and so do we. Hence, the only direct evidence of phenoxy being included in the chemicals sprayed by Cane Air also shows the amount of phenoxy sprayed was not sufficient to harm the soybeans.
This leaves for consideration the direct evidence as to Mayeux’s direct application of phenoxy chemicals and the possibility of a phenoxy chemical residue from a prior spraying left in the tanks by Cane Air. Mr. Mayeux testified to having made direct applications of phenoxy to weeds located on the headlands of the 230 acre tract by means of a stick and rag while he was flagging for the plane. In testifying how he made this direct application, Mayeux said:
Q. Applications that you made with the rag that you referred to, was that to the beans or to the weeds?
A. That was to the weeds growing above the beans. It was a sack on a pole that it’s saturated with the 2,4-D, and what it amounts to instead of walking over four rows on each side, I walked down one and I could use, well, I could just reach a little bit further. And this was only done where I was standing while I was flagging for the airplane.
*310 Q. So you didn’t apply it throughout the field?
A. No.
Q, You did not apply to the beans?
A. No, Sir. If I did it would have killed the beans.”
and upon being asked why he applied the chemicals, he said:
“Well, right on the headland, generally when you come to the headland, you have your weed control, it’s not as great because you shut off your valves because in the process of making a turn, you put too much, okay? So naturally, the weeds are heavier on your turnovers, well, they were above the beans at the time. I was flagging for the airplane in my pickup truck and I made my, well, I made me a rag and while I was waiting for him to go get a load and come back, I would do this.”
The report of Mr. Crawford, with the United States Environmental Protection Agency, was introduced in evidence as a joint exhibit of the plaintiff and the defendant. Attached to the report was an affidavit by Mr. Mayeux in which he stated he had sprayed the Chrysler Plymouth lot with a phenoxy chemical for weed control on two occasions in late July and August.
Also, according to this affidavit, on August 24, the day after the easternmost 50 acres of the 230 acre tract had been sprayed by Cane Air, at Mr. Mayeux’s request, Mr. Elledge collected samples of vegetation in the field. Mr. Elledge testified these samples were delivered to a private lab for analysis. Mr. Mayeux testified that he did not know whether the samples were delivered or whether the samples were analyzed. There is no report in the record as to an analysis of these samples.
According to Mr. Crawford’s report, he collected a substantial number of vegetation samples in the field on August 29th and 30th and also obtained a sample of the rag used by Mr. Mayeux to make the direct application. Mr. Epps’ analysis of only two samples is shown in the record i.e., those of soybean leaves collected at site A and of the rag used by Mr. Mayeux in making direct application of phenoxy in the field. His analysis of the soybean leaves was as follows:
Lab. No. Sample
- 2,4-D
Soybean leaves
152X # 149397 Site A Sub # 1 0.09 ppm
153X # 149397 Site A 0.15 ppm
The site (A) from which the soybean leaves were collected was in the cut near the first headland on the eastern side of the 230 acre tract in close proximity to the lot of La-Place Chrysler Plymouth where Mayeux testified he had used phenoxy for weed control in late July and in early August.
The chemical analysis of the rag used by Mr. Mayeux in making the direct application of phenoxy was as follows:
Lab.
No. Sample Material Extracted From Rag
151X Old Rag Isooctyl Ester of 2, 4-D 4.3%
Isooctyl Ester of Silvex 3.9%
In his deposition Mr. Epps stated this concentration of phenoxy in the Isooctyl Ester was a high concentration. Mr. Davis, the expert submitted by Cane Air, testified the phenoxy on the rag was in an “Ester formulation”, and as such would change from a liquid to gas, i.e., volatilize when applied at high temperatures and as a gas be distributed by air currents. Considering the fact the direct application of the phe-noxy by Mr. Mayeux was in late July and August and applied when the field was being flown over by an airplane, a reasonable hypothesis as to the way in which the phenoxy was distributed over the field is that as Mr. Mayeux directly applied the chemical containing the phenoxy, it volatilized and was distributed over the field by the air current created by the airplane while spraying the field.
On direct examination, Mr. Acosta, the operations manager for Cane Air, testified that on the spraying jobs immediately prior to the spraying of Mr. Mayeux’s soybeans, on July 19 and 21st and on August 4th and 23rd, the chemical sprayed by the same plane used to spray Mr. Mayeux’s field was an insecticide as opposed to a herbicide in which grouping phenoxy belonged. On ex *311 amination, it was shown that the documents put into evidence to support Mr. Acosta’s testimony as to July 19th when a sugar cane test plot was flown for the USDA, there was no indication on the documents as to what chemical was flown. However, he testified that to his knowledge the USDA did not spray phenoxy on sugar cane. On two sprayings prior to the spraying of Mr. Mayeux’s soybeans on August 4th, a mixture of Guthion (an insecticide) and 2,4 — D (a phenoxy) was sprayed by the same plane which sprayed the Mayeux crop. There was, however, a non-phenoxy chemical sprayed by the plane before it commenced spraying Mayeux’s crop.
When he appeared earlier in the proceeding, Mr. Acosta was asked:
Q. Mr. Acosta, what generally is the procedure when you spray one chemical and then you have to in turn spray another, general procedure for the operating of that?
A. Well, what determines it is the type of chemical in use, whether it is herbicide or whether it is insecticide generally will determine.
He was not asked and, therefore, never testified as to what procedure is required when changing from a herbicide to an insecticide. According to the state regulations, aerial applicators are required to purge or flush the plane tanks and equipment when changing from a herbicide to an insecticide. The trial judge in stating his reasons for refusing to cast Riverside in judgment noted that a phenoxy had previously been sprayed and there was “no showing that the spraying equipment was flushed or purged”. Although Acosta did testify that a phenoxy was sprayed prior to the August 4th spraying of Mayeux’s crop, it was not the spraying immediately preceding the Mayeux spraying, therefore, there was no requirement that the tanks and equipment be purged or flushed. Further, since this is not a strict liability case under Article 667, there was no requirement that Cane Air absolve itself of liability.
Rather, the burden of proof was on Mr. Mayeux to show that the reduction in yield of the field north of the Airline Highway, as compared to the field south of the Airline Highway, was caused by some action or lack of action on the part of Cane Air. Mr. Mayeux has failed to meet that burden by a preponderance of the evidence. From the record here, it is just as probable the reduction in the soybean yield was caused by the direct application of phenoxy by Mayeux or by the plant diseases, or from soil conditions as it is probable it was caused by Cane Air’s failure to flush or clean its tanks. Accordingly, the judgment of the trial court is reversed. Each party to bear his own costs.
REVERSED.